**CONTINENTAL AIRLINES CORPORATION, Continental Airlines, Inc., and Texas Air Corporation, Delaware Corporations; Defendants Below, Appellants,**

v.

**AMERICAN GENERAL CORPORATION and American General Life Insurance Company, Texas Corporations; Plaintiffs Below, Appellees.**

Supreme Court of Delaware.

Submitted: Sept. 6, 1989.

Decided: June 5, 1990.

Rehearing Denied June 25, 1990.

Paul P. Welsh (argued), Palmer L. Whisenant, Matthew B. Lehr of Morris, Nichols, Arsht & Tunnell, Wilmington, and Mark Powers, Houston, Tex., for appellants.

E. Norman Veasey, Jesse A. Finkelstein, James C. Strum of Richards, Layton & Finger, Wilmington, Harry M. Reasoner (argued), David T. Harvin, Allan Van Fleet, Karen B. Jewel of Vinson & Elkins, and Kurt Schreiber, Houston, Tex., for appellees.

Before CHRISTIE, C.J., MOORE, J., DUFFY, Retired Justice (sitting by designation pursuant to Del. Const. Art. IV, § 38), BIFFERATO and TAYLOR, Judges (sitting by designation pursuant to Delaware Const. art. IV, § 12), constituting the Court en banc.

MOORE, Justice, for the majority:

Continental Airlines, Inc. ("Continental") and Texas Air Corporation ("Texas Air") appeal a decision of the Court of Chancery granting summary judgment against them and in favor of American General Corporation and American General Life Insurance Company (collectively "American General") on cross-motions for summary judgment. This case arises from a dispute over whether a contractual right possessed by American General, a former minority shareholder of Continental, entitles it to the same option to purchase shares of Texas Air as the employee-shareholders of Continental received relating to a going-private merger in which Continental was merged into a subsidiary of Texas Air.

The Court of Chancery held that American General acquired its contractual rights from a loan agreement which provided that American General would receive, upon a merger, the same merger consideration received by other Continental shareholders. American General was found to be entitled to the same options granted to the Continental employee-stockholders in the merger because those options were property "issued or payable with respect to or in exchange for" outstanding Continental stock. We agree and, accordingly, affirm.

## I.

On June 10, 1983, American General and Continental executed an agreement (the "Loan Agreement") designed to satisfy Continental's need for operating funds which had developed as a result of substantial financial losses that Continental had sustained in previous years. Under the terms of the Loan Agreement,[1] American General loaned $40 million to Continental by purchasing 10 four million dollar 11% senior Continental notes due in 1988, which were secured by a separate written guaranty by Continental and also by certain Continental real estate. American General also received the following additional considera-

tion: (a) Continental warrants ("Warrants") valid for five years, enabling American General to purchase up to five million shares of common stock at $8.50 per share; (b) an option (the "AG Option") entitling American General to buy up to 25% of new issues of Continental stock at the issue price for ten years; the AG Option thus protected the warrants or the stock that might be acquired by exercising those warrants from possible dilution; (c) the right under § 3.8 of the Warrants, to receive the same consideration received by other Continental shareholders in the event of a merger involving Continental; and (d) the right to veto any prospective proposed merger or restructuring of Continental.

The Loan Agreement was followed by continued poor operating results and a major strike. Continental eventually filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code. By early 1985, Continental had begun to turn things around. Continental and Texas Air offered the employees various incentives including a profit sharing program that resulted in some employee ownership of stock.

In July, 1985, prior to the time that Continental emerged from the bankruptcy proceedings, Texas Air, the parent corporation and then 72% owner of Continental, proposed a going-private merger with Continental. Although this initial proposal was unsuccessful, Texas Air's desire to merge continued. In December, 1985, American General bought 1,000 shares of Texas Air. In December of 1986, Texas Air and Continental finally agreed on terms for a going-private merger. Pursuant to the terms of this transaction Continental's minority shareholders were to receive $16.50 per share in a cash out merger. Continental would then become a wholly owned subsidiary of Texas Air.

Prior to the merger Texas Air announced a related proposal in which Continental employees who held Continental stock would

---

**1.** The Loan Agreement was not embodied in one document but rather consisted of five separate parts: (1) four million dollars worth of notes; (2) a note purchase agreement; (3) the guaranty

of the notes; (4) warrants to purchase five million shares of Continental stock; and (5) an anti-dilution option.

receive, in addition to the $16.50 per share, an option to exchange their shares of stock in Continental for Texas Air stock at a 1 to .8 ratio, which reflected the then-market prices of the two stocks.[2] Soon thereafter, American General filed a motion in the Court of Chancery to enjoin the merger on the ground that it discriminated among Continental's minority shareholders. The motion also sought to preserve American General's "contractual right to acquire an interest in Continental or Texas Air." Although American General's suit was not a class action, other Continental minority shareholders did file three separate class actions seeking to enjoin the merger on behalf of the class of Continental minority shareholders other than American General.

Apparently after realizing the possible legal consequences of the option offered to the Continental employee-shareholders, Texas Air withdrew it and attempted to recast it as a transaction separate from the merger of Continental and Texas Air (the "Employee Option"). Under the Employee Option, in addition to the $16.50 per share received by every shareholder, qualifying Continental employee-shareholders would receive options to purchase Texas Air common stock at the ratio of $8/10$ of a share of Texas Air for each former Continental share, exercisable eighteen months after the merger. This Employee Option, however, was not set forth in the merger agreement ("Merger Agreement").

The Court of Chancery denied American General's motion for a preliminary injunction on the grounds that American General had failed to show irreparable harm.

*American Gen. Corp. v. Texas Air Corp.,* Del.Ch. C.A. Nos. 8390, 8406, 8650 and 8805, slip op. at 14, Hartnett, V.C. (Feb. 5, 1986). Essentially, the trial court held that even if the merger would breach American General's rights under the Warrants [3] and was otherwise procedurally unfair, remedies for these breaches existed following the merger. *Id.* On February 6, 1987, one day following the denial of the preliminary injunction, Texas Air completed a going-private merger with Continental through a wholly owned subsidiary of Texas Air formed for the purpose of merging with Continental. Continental then no longer had any shares publicly outstanding.

On March 3, 1987, American General moved for partial summary judgment arguing essentially that under § 3.8 of the Warrants, it was entitled to receive, upon exercise, the same opportunity to exchange its Continental shares purchasable under the Warrants for $8/10$ of a share of Texas Air that the Continental employee-shareholders received by way of the Employee Option. Texas Air responded in two ways. First, it moved for summary judgment claiming that the merger did not violate any term in the Warrant contract and that American General lacked standing as a stockholder to maintain unfair price and dealing claims. Second, the Texas Air Board unilaterally amended the Employee Option so that it would become void if American General obtained a ruling that it was entitled, under the Warrants, to receive the same consideration given to the Continental employee-shareholders.[4] American General contends that, contrary to Texas Air's assertions, the

**2.** Although Texas Air described this proposal as an employee incentive/employee benefit plan, *the only eligible employees were those who owned Continental stock.* It is clear that the major beneficiaries of this option were Continental's senior officers and managers, including defendant Frank Lorenzo, who was Chairman of the Board of Directors of both Texas Air and Continental, and who alone owned approximately 25% of the shares eligible for the exchange. For Lorenzo, the option translated into a four million dollar profit because at that time the option price was well under half the trading price of Texas Air stock. The remaining senior officers and managers owned 45% of the eligible shares. Furthermore, the method by which the stock was obtained by the employees was

apparently irrelevant; to qualify for the option it was not required to have been received in an employee incentive or employee stock ownership plan.

**3.** The Court suggested strongly that, based on the record before it, at that time, that American General would prevail on the issue of whether § 3.8 was breached by the merger.

**4.** On May 20, 1987, the Purchase Option, including the self-destruct mechanism, was approved by the stockholders. The parties disagree whether the options were issued after the Vice Chancellor's ruling.

Employee Options were in fact issued, but with a condition subsequent attached causing them to fail if this Court rules in favor of American General. On March 13, 1987, while the cross-motions for summary judgment were pending, the minority shareholders other than American General settled their class action suits. They received an additional $3.75 per share (on top of the original $16.50). The settlement agreement did, however, provide that the stockholder-employees of Continental could not receive the additional $3.75 per share if they chose to exercise their options. The Court of Chancery approved this settlement.

In his opinion on the cross-motions for summary judgment, the Vice Chancellor held that the merger violated American General's contract rights under the Warrants. *American Gen. Corp. v. Continental Airlines Corp.*, Del.Ch., C.A. No. 8390, Hartnett, V.C., 1988 WL 7393 (Jan. 26, 1988). The basis for this finding was the conclusion that § 3.8 of the Warrants gave American General the absolute right to receive the same consideration that *any* other Continental stockholder had received in the merger. The court held that the Employee Option as instituted and implemented was a part of the total merger consideration paid by Texas Air to the Continental employee-stockholders and therefore, under § 3.8 of the Warrants, American General was entitled to $16.50 cash *plus* an option to purchase Texas Air stock, the same merger consideration given to the stockholder-employees.

The court also held that American General had standing as a stockholder to pursue its claims of breach of fiduciary duty against Texas Air. The court rested this holding on the simple fact that it was undisputed that American General was a Texas Air shareholder before and during the alleged breaches of duty.

The court held, however, that the defendants had not violated any implied obligation of good faith and fair dealing at the time that the Loan Agreement was entered into by failing to disclose that Continental would merge with another corporation and thus render the Warrants and AG Option virtually worthless. The Vice Chancellor reasoned that the Loan Agreement expressly gave American General the right to veto *any* merger, but that American General had waived that right while Continental was in bankruptcy. The Court refused to find or enforce an implied obligation where an express provision granting that same right had been waived.

## II.

The Vice Chancellor's decision on cross-motions for summary judgment was based entirely upon a paper record, thus our scope of review calls for us to review the entire record and draw our own conclusions from the facts if the findings below are clearly wrong and if justice requires. This is especially true when the findings below derive from deductions, reasoning or inferences.[5] *Dutra de Amorim v. Norment,* Del.Supr., 460 A.2d 511, 514 (1983); *Fiduciary Trust Co. v. Fiduciary Trust Co.,* Del.Supr., 445 A.2d 927, 930 (1982); *Levitt v. Bouvier,* 287 A.2d 671, 673 (1972).

### A.

 Continental argues that the Vice Chancellor's findings with respect to his

---

**5.** The Vice Chancellor stated that "[b]oth parties concede this dispute is ripe for summary judgment on the issues raised and neither asserted that there were any genuine issues of material fact." *Continental Airlines,* slip op. at 4. Furthermore, appellants concede in their briefs on appeal that all issues presented are pure issues of law. However, at oral argument the appellants attempted to qualify these statements by saying that what they meant was that each party believes that, from its perspective, there are no material questions of fact.

We note that the general rule is that cross-motions for summary judgment do not obligate the Court to render summary judgment, rather the trial court's duty is to determine independently whether there are any genuine issues of material fact. However, in this case both parties moved for summary judgment on the same issue—the interpretation of § 3.8—and both agreed that this was a question of law. We, therefore, find Texas Air's assertion, that if we do not adopt its interpretation of § 3.8 there is a *question of fact, to be without merit.* Texas Air has conceded that this appeal presents a question of law concerning the interpretation of a contract provision.

interpretation of § 3.8 of the Warrants were erroneous. In essence, it argues that the Vice Chancellor's interpretation of § 3.8 gives it extraordinary and unwarranted breadth. The Employee Option, it contends, was not merger consideration and even if it was, American General cannot reach it under § 3.8.

We find the Vice Chancellor's conclusion that the Employee Option was merger consideration to be sound and completely supported by the record. § 3.8 provides:

*Reorganization, Merger, etc. If,* after the date hereof, *any* reorganization or reclassification of the capital stock of the Company (except as provided in Section 3.5), or consolidation or *merger* of the Company with another corporation (except a merger in which the Company is the surviving corporation and which does not result in any reclassification of or change in the outstanding Common Stock of the Company except a split or combination of shares), or the sale or conveyance of all or substantially all of its assets to another corporation *shall be effected, then, as a condition of such* reorganization, reclassification, consolidation, *merger,* sale or conveyance, *lawful and adequate provision shall be made whereby the holder hereof shall thereafter have the right to purchase and receive upon the basis and upon the terms and conditions specified in this Warrant and in lieu of the shares of the Common Stock of the Company immediately theretofor purchasable and receivable* upon the exercise of the rights represented hereby, *such shares of stock, securities or property as may be issued or payable with respect to or in exchange for a number of outstanding shares of such Common Stock equal to the number of shares of such Common Stock purchasable and receivable upon the exercise of the rights represented hereby immediately prior to such* reorganization, reclassification, consolidation, *merger,* sale or conveyance,

*and* in any such case *appropriate provision shall be made* with respect to the rights and interests of the holder of this Warrant *to the end that the provisions hereof* (including without limitation provisions for adjustment of the Purchase Price of the number of shares purchasable upon the exercise of this Warrant) *shall thereafter be applicable, as nearly as may be in relation to any stock, securities or assets thereafter deliverable upon the exercise hereof.*

(emphases added). It is undisputed that under Delaware General Corporation Law every corporation may create and issue rights or options entitling the holder to purchase from a corporation shares of its Stock. 8 *Del.C.* § 157; *Moran v. Household Int'l Inc.,* Del.Supr., 500 A.2d 1346, 1351, 1352 (1985); *Michelson v. Duncan,* Del.Supr., 407 A.2d 211, 224 (1979). Moreover, in *Moran,* this Court clearly stated that " '[a]nti-destruction' clauses generally insure holders of certain securities of the protection of their right of conversion in the event of a merger by giving them the right to convert their securities into whatever securities are to replace the stock of their company." *Moran,* 500 A.2d at 1352. This is clearly the purpose of § 3.8. The language provides that a warrant holder has the right to receive that property which is "issued or payable with respect to or in exchange for" the outstanding common stock.[6] The issue thus becomes whether the Employee Option was so issued.

Unfortunately, the Merger Agreement did not expressly mention the Employee Option. The Vice Chancellor, therefore, correctly examined the surrounding circumstances, examining the meaning and purpose of the transaction. *Klair v. Reese,* Del.Supr., 531 A.2d 219, 223 (1987). He concluded that there were a plethora of statements made by Texas Air agents indicating that the Employee Option was part of the merger transaction. Specifically, the Vice Chancellor relied on three such statements. First, in an October 22, 1985

---

**6.** Although appellants contend that § 3.8 is merely boilerplate language lifted from a formbook and that if the Vice Chancellor's construction is upheld it will have widespread commercial implications, counsel conceded at oral argument that the fact that § 3.8 is widely used was not contained in the record and therefore not properly before this Court.

letter to the American Stock Exchange, counsel for Texas Air stated:

> In addition, *Texas Air's Merger proposal provides* that Texas Air will adopt a plan *in connection with the merger* under which new employees of Continental who receive Texas Air Notes in the Merger will have the right to exchange such Notes for Texas Air common stock. *Texas Air believes that this plan is an important part of the Merger proposal,* since a substantial number of Continental employees own Continental common stock, and Texas Air believes that such equity ownership has been an important element of Continental's recent success. However, under Delaware law (the jurisdiction of Continental's incorporation), it is not possible to issue different consideration in the Merger in exchange for Continental common stock based upon whether a stockholder is a Continental employee or not. Accordingly, in order to permit Continental employees to continue to have an equity participation in their employer after the Merger, the Merger Agreement contemplates that employees will be granted this right to purchase Texas Air Notes for Texas Air common stock under a new Texas Air stock option plan.
>
> *Under the merger proposal,* the new Texas Air options would be granted to persons who were employees of Continental on October 31, 1985.

*Continental Airlines,* slip op. at 14. Second, in a June 9, 1986 memorandum Texas Air's general counsel characterized the transaction as follows:

> In connection with Texas Air's prospective acquisition of the outstanding minority interest in Continental Airlines, the employees will be given an option to exchange all Continental stock that they owned as of October 31, 1985 for Texas Air common stock at a rate of ⁸⁄₁₀th of a share for each Continental share owned.

*Id.* Moreover, on the very day that the merger occurred, Texas Air continued to characterize the Employee Option as being merger consideration:

> Under the agreement, Continental common stock is exchangeable for $16.50 cash per share. Employees of Continental or its subsidiaries, who owned Continental common stock on October 31, 1985, and still own it today, will receive in addition to the $16.50 per share an option to purchase eight-tenths of a share of Texas Air common stock for each share of Continental common stock.

*Id.,* slip op. at 15.

We note that other statements also indicate that the Employee Option was deemed merger consideration. For instance, in a September 17, 1986 bulletin to employees entitled "Texas Air finalizes plan for taking Continental private", Continental noted:

> Continental employees, who owned Continental common stock on October 31, 1985, and continued to own it on the going-private effective date, will receive *in addition to $15.20 per share cash purchase of those shares* an option to purchase eight-tenths of a share of Texas Air common stock for each share of Continental common stock.

Contrary to Texas Air's assertion, these statements, and others similar to them, cannot be described as "non-contractual scraps." Rather, they clearly indicate that Texas Air believed that the Employee Option was a key part of the merger throughout the entire period leading to the merger. Thus, because the Employee Option was issued "with respect to or in exchange for" Continental common stock, American General's rights under § 3.8 were activated entitling American General to that property.

This construction of § 3.8 is clearly supported by the intentions of the parties. The trial court was obligated to construe the Loan Agreement as a whole giving priority to the intentions of the parties. *E.I. duPont de Nemours v. Shell Oil Co.,* Del.Supr., 498 A.2d 1108, 1113 (1985).

The Vice Chancellor correctly found that the *entire* Loan Agreement clearly evidenced the fact that both the parties intended that American General would have a long term ownership in Continental. This conclusion is supported by several facts.

First, it is apparent that American General would not have loaned an essentially bankrupt airline $40 million without such an assurance; in fact "[i]t is not disputed that American General flatly rejected advancing any funds to Continental without it receiving long term equity in Continental." *Continental Airlines,* slip op. at 12. Second, the AG Option, a ten year anti-dilution provision, was incorporated into the agreement. This, combined with the fact that a note guaranty provision incorporated into the Loan Agreement granted American General the right to veto a Continental merger, showed that the parties fully contemplated that American General would maintain substantial stock holdings in Continental even after a merger. Finally, § 3.8 itself, an anti-destruction clause, protects the warrant holders' conversion rights in the event of a merger. Accordingly, because Texas Air chose to provide Continental employee-stockholders with the opportunity to obtain an equity position in Texas Air, it was consistent with the parties' intentions to find American General entitled to the same opportunity.

Appellants argue that, notwithstanding the statements made by them, something given by Texas Air to the employee-shareholders of Continental could not be merger consideration because the merger occurred between Continental and a subsidiary of Texas Air, not between Continental and Texas Air itself. Appellants strenuously assert that the Vice Chancellor disregarded the different entities when he referred to the merger as between Continental and Texas Air.

Texas Air, however, was a party to the Merger Agreement. The cash necessary to pay the Continental stockholders for their shares came from Texas Air. In short, the fact that the Employee Option came from Texas Air is not inconsistent with the proposition that the Employee Option was merger consideration.

### B.

■ The appellants raise a series of other arguments with one central theme. Essentially, they contend that the Employee Option is fundamentally different from merger consideration. They argue that it was not "pure" merger consideration because only qualifying employees were entitled to it and American General did not qualify. Construing the Employee Option differently, they claim, would inappropriately allow warrant holders to "pick and choose" among different forms of consideration legitimately offered to shareholders.

The simple response to the appellant's argument is that, pursuant to § 3.8 of the Warrants, when Texas Air granted an option to *some* of the stockholders of Continental (the employee-stockholders), it was required offer the same consideration to American General. Texas Air cannot escape the plain language of § 3.8. The fact that the Employee Option, as eventually structured, required the employee-shareholders to meet various employment conditions to qualify for the options was irrelevant because the option to purchase Texas Air stock was "issued and payable with respect to or in exchange for" the stock owned by the employee-shareholders.

### C.

■ Continental also argues that the only amount American General can receive under § 3.8 is the $16.50 set forth in the Merger Agreement and not the price to which the merger consideration was or may be increased pursuant to appraisal or breach of fiduciary duty claims. Texas Air claims that if American General can do this they can, in effect, recover for past breaches of fiduciary duties which were never owed to American General. In other words, any amount the Continental shareholders might hope to recover on a breach of fiduciary duty claim arising from the merger was not issued or payable to such shareholders in the merger. American General argues, on the other hand, that the "upward adjustment" of the price in a post-merger legal proceeding squarely falls within the language of § 3.8 which provides that upon a merger American General's warrants are exercisable for the property "issued or payable with respect to or in exchange for" Continental common

stock. This language, American General argues, is consistent with the proposition that amounts recovered in post-merger legal proceedings are "payments" for shareholders shares. *See* 8 *Del. C.* § 262(i). Section 3.8 does not alter this proposition because it does not indicate when or in what manner the amount payable must be determined.

The Vice Chancellor's opinion does not appear to expressly address this issue.[7] However, because we believe that it is, at the very least, an implicit holding of the opinion and because the May 12, 1988 order implementing the rulings in the opinion indicates that this issue had been decided, we believe that this issue is properly before us.

Under § 3.8 of the Warrants, American General is entitled to receive the same fair price established in post-merger proceedings as did the other Continental shareholders. Again, the language of § 3.8 compels this result. It provides that the warrant holders have the right to purchase "such ... property that may be issued or *payable with respect to* ... a number of outstanding shares". We conclude that American General was entitled to the fair price of its shares as established in post-merger proceedings because that value is "payable with respect to" the outstanding shares. This reading of § 3.8 is entirely consistent with the whole purpose of § 3.8; namely, to put American General in a position comparable with other shareholders. *See B.S.F. Co. v. Philadelphia Nat'l Bank,* Del.Supr., 204 A.2d 746, 750–51 (1964).

Additionally, we believe that to hold otherwise would be inequitable. If, as appellant contends, the value of the shares established in a post-merger proceeding were not contemplated by § 3.8, the price payable to the warrant holders could have been manipulated by Continental, undermining the purpose of § 3.8.

We emphasize that this holding *does not* rest on any notions of fiduciary duty. Rather, American General's right to the same fair price for its shares payable to other shareholders is based solely on its contractual rights under § 3.8. The very purpose of § 3.8 was to ensure that the warrants survived the merger without being exercised. Thus, it is clear from § 3.8 that American General was not required to exercise the warrants prior to the merger to be entitled to the same fair price for its shares that the other Continental shareholders received in lieu of their stock.[8]

 Continental also argues that the Vice Chancellor incorrectly concluded that American General has standing to assert claims as a Continental shareholder. Texas Air argues that American General purposefully bought shares in Texas Air after the first merger proposal was abandoned expressly to attack the going-private merger. However, at the time that American General bought the shares of Texas Air it is not disputed that none of the alleged wrongs had occurred. This case is, therefore, not a case in which standing has been contrived. Texas Air's bare allegation that American General bought at a time when the alleged wrongs were "in view" is insufficient to support a motion for summary judgment. Accordingly, the Vice Chancellor correctly denied Texas Air's cross-motion for summary judgment on this issue.

### D.

 Finally, we address the conduct of Texas Air by which they attempt to turn

---

7. On November 29, 1988, we denied a motion to strike those portions of the appellants' opening brief addressing this issue.

8. As a point of clarification, we note that American General merely requests that if it "can establish, with respect to the stock ... owned outright, that the fair value of Continental stock was considerably more than $16.50 per share, American General is also entitled to that higher consideration for the shares subject to its warrants." American General is entitled to receive

only the same merger consideration that the employee-stockholders received. The employee-stockholders received the $16.50 merger price plus the option to purchase Texas Air stock at $20.63 per share, or they received $16.50 plus an additional $3.75 per share on the settlement of their class actions without an option to purchase the shares of Texas Air. Thus, if American General were to exercise its options, it would be entitled to only $16.50 for the shares purchasable under the warrants.

the Vice Chancellor's opinion and the decision of this Court into mere advisory opinions. The Texas Air board adopted a resolution amending the Employee Option so that it would become void if it were ever judicially determined that American General was entitled to the options. Apparently, the options have been issued, but with a condition subsequent attached—if this Court reverses the Chancery Court then the options are valid, if not they will be void.

The attempt to void these options must fail. During oral argument on American General's motion to preliminarily enjoin the merger, attorneys for Continental and Texas Air specifically told the Vice Chancellor that if American General was correct in their interpretation of § 3.8, their right to specific performance would survive the merger.[9] It is axiomatic that a court of equity will not allow a litigant to represent to the court that a preliminary injunction should be denied because equity can later be done and then later to frustrate the power of the court to do equity.

Texas Air candidly admitted at oral argument that it had attempted to put itself in a situation in which it could not lose and thereby turn this opinion into a mere advisory opinion. The termination condition was imposed unilaterally by Texas Air. The Vice Chancellor specifically held, and we affirm that holding, that the Employer Option was merger consideration. That consideration cannot now be withdrawn from American General. Texas Air's conduct in attempting to manipulate the Delaware courts will not be permitted.

The judgment of the Court of Chancery is AFFIRMED.

DUFFY, Retired Justice, dissenting in part:

I concur in that part of the judgment of the Court which determines that American General has standing as a stockholder to sue Continental for alleged breaches of fiduciary duty. And, while I agree that American General has established its right to relief based on § 3.8 of the Stock Warrants, in my view, it cannot now be determined as a matter of law on unquestioned facts, that American General is entitled to exchange rights for Texas Air stock.

A.

This is an interlocutory appeal from an order of the Court of Chancery ruling on cross motions for (partial) summary judgment. The case arises from a dispute between the parties over their respective rights in a contract (which was divided into 5 separate documents) between them.

Continental and the other defendants (defendants) sought a summary judgment on the ground that they were entitled to it as a matter of law based on their reading of the contract, particularly the Stock Warrants (one of the 5 documents) held by American General and the related plaintiff (plaintiffs). A majority of the Court affirms the Vice Chancellor's order denying Continental's motion for summary judgment and I agree with that conclusion.[1] In

---

9. Counsel stated:

> If our friends are right about what their contract rights are, they are not irreparably injured by the merger in the sense that warrants a preliminary injunction here because it's not truly irreparable. If they were right it could be fixed.
>
> They say they have a right to specific performance of their option, and that that would survive. They say that under their warrants they would have the right to acquire shares in the ongoing subsequent entity. That would survive, if it were real.
>
> Now, none of it is real. But if it were, it would.

1. Specifically, § 3.8 of the Warrants permits a merger by Continental and, after merger, the Warrant holder has

> "the right to purchase ... upon the basis and upon the terms ... specified in this Warrant and in lieu of the shares of the Common Stock ... immediately theretofore purchasable ... upon the exercise of the rights represented hereby, such shares of stock, securities or property as may be issued ... in exchange for a number of outstanding shares of such Common Stock equal to the number of shares ... purchasable ... upon the exercise of the rights represented hereby immediately prior to such ... merger...."

The Warrants were, of course, a contract binding upon the corporation surviving the merger.

brief, defendants are not entitled to judgment because the specific language of the Warrants gives plaintiffs the right to acquire, after merger, the quantum of "stock, securities or property" given in the merger in exchange for the number of shares to which American General had a right, had the Warrants been exercised immediately prior to merger. And so plaintiffs are entitled to obtain that aggregate, whatever it may be.

The same provision of § 3.8 which bars judgment to defendants applies to plaintiffs' claim and, under that language, plaintiffs have shown their right to relief. In sum, by proving the Warrants and the merger and that consideration ("property") had been given in exchange for Continental stock, plaintiffs have established the liability of defendants and their right to a judgment. *Compare Gamble v. Penn Valley Crude Oil Corp.*, Del.Ch., 104 A.2d 257 (1954) (in which a corporation had outstanding a valid option to buy its shares at the time when it voluntarily filed a certificate of dissolution).

But are plaintiffs entitled to a *summary* judgment determining now that they are entitled to exchange rights for Texas Air stock? That is the inquiry before the Court and it invokes familiar and settled rules of procedure.

### B.

Rule 56(c) of the Court of Chancery provides that a summary judgment sought shall be rendered forthwith, if the pleadings and affidavits (and other documents) "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law".

The case law applying Rule 56(c) is well known and citation thereof seems superflu-

ous. But I list some of the cases, not because the law is uncertain but because, in my view, the majority has ignored the black letter law recited time and again in the decisions. Thus, a party moving for a summary judgment has the burden to prove, clearly, the absence of any genuine issue of fact and any doubt must be resolved against the moving party. *Brown v. Ocean Drilling & Exploration Company*, Del.Supr., 403 A.2d 1114, 1115 (1979). And, a motion for summary judgment "must be denied if there is any reasonable hypothesis by which the opposing party may recover, or if there is a dispute as to a material fact or the inferences to be drawn therefrom." *Bershad v. Curtiss–Wright Corp.*, Del.Supr., 535 A.2d 840, 844 (1987), quoting *Vanaman v. Milford Memorial Hospital, Inc.*, Del.Supr., 272 A.2d 718, 720 (1970). In considering a motion for summary judgment the Court does not weigh evidence presented by either party. *Empire of America v. Commercial Credit*, Del.Supr., 551 A.2d 433, 435 (1988), citing *Continental Oil Co. v. Pauley Petroleum, Inc.*, Del.Supr., 251 A.2d 824, 826 (1969). And the Court views all facts in the light most favorable to the non-moving party. *Baylis v. Wilmington Center, Inc.*, Del. Supr., 477 A.2d 1051, 1057 (1984).

### C.

The majority acknowledges the general rule that, on cross-motions for summary judgment, the Court is not obliged to give judgment for either party but, rather, the Court's duty is to independently determine whether there is a genuine issue of material fact. The majority excuses itself from performing that duty by saying that defendants had said that all issues presented are issues of law and defendants cannot now raise a question of fact.[2] (At 1164).

---

8 *Del.C.* § 259; *Fitzsimmons v. Western Airlines, Inc.*, Del.Ch., 290 A.2d 682, 685, 689 (1972).

2. At oral argument defendants' counsel (in a colloquy with the Court regarding defendants' intent as to the Stock Option) said flatly that "I never conceded that there was not a fact issue of intent ... there has never been a concession that I know of that the issue of

intent would not be relevant in resisting *his* [i.e., plaintiffs'] summary judgment motion" (Emphasis added).
And defendants' counsel specifically invited opposing counsel to cite the record where any such a concession had been made. Plaintiffs have not done so, nor has a majority of the Court.

There is a certain irony to that ruling because, after refusing to consider defendants' argument as to a fact issue, the majority immediately examines the "surrounding circumstances" (At 1165)—all of them factual—and then reaches a conclusion from those circumstances, particularly with respect to what Texas Air intended in granting the Employee Stock Option. And the majority in so doing, not only failed to give defendants (as the parties opposing plaintiffs' motion) the benefit of construing ambiguities in their favor (contrary to *Vanaman, Ocean Drilling, Bershad,* and many others) but, moreover, did not even consider defendants' affidavit.

The merger agreement does not refer in any way to the Option offered by Texas Air to former employees of Continental. The issue then is whether the record as to the "surrounding circumstances" (At 1165) shows on unquestioned facts that Texas Air intended to make the Option "merger consideration". That term is not defined in the Court's opinion, but I take it to mean an option (to buy ⁸/₁₀ share of Texas Air's stock for $16.50) given in exchange for Continental shares after the merger.

The terms of merger were agreed upon in December, 1986, and the merger was consummated on February 6, 1987. The majority opinion acknowledges that Texas Air's first Option plan was withdrawn and that the plan executed in 1987 had additional requirements—"qualifying Continental employee-shareholders would receive options to purchase Texas Air common stock—exercisable eighteen months after the merger" (At 1163). And yet to prove that Texas Air intended to make that Option "merger consideration" the majority relies on a 1985 letter written by Texas Air counsel; a June, 1986 memorandum of counsel; and a September, 1986 bulletin to employees—all of them predating December, 1986 and all of them ambiguous [3] as to whether they show that, in February, 1987, Texas Air gave the Option in exchange for Continental shares to a special class of stockholders. And the same uncertainty

appears in the only record reference by Texas Air on the date of the merger.

The majority does not consider an affidavit, dated January 21, 1987, by a Texas Air Senior Vice President and Corporate Treasurer, stating that the exchange Option was originally proposed to be a part of the merger transaction but the

transaction was changed so all Continental stockholders, including employees, will get exactly the same merger consideration, i.e., $16.50 cash per share. Texas Air will then grant each employee an option which will require the employee to continue in the employ of Continental for eighteen months following the merger date. The option will allow the employee to purchase, for $16.50, eight-tenths of a share of Texas Air common stock for every share of Continental common stock owned by that employee on October 31, 1985 and on the merger date. Texas Air views this option as an employee benefit and incentive.

### D.

The majority of the Court does not argue that, as a matter of law, defendants were unable to amend or withdraw the first Option plan. It is undisputed that they did so. And the Court does not say that Texas Air was unable to adopt an Option plan without making it merger consideration. The case thus centers on the Option plan, whatever it in fact was, when the merger was made in February, 1987. As I have said, the majority does not analyze or demonstrate from the sparse and ambiguous record what the facts were. Indeed, the closest it comes to so doing is found in a footnote referring to corporate insiders. (At 1162). With some emphasis, the majority criticizes the first plan, but without noting whether the offending provisions were repeated in the amended Option plan which is the one now before the Court. Although I have no desire to defend either plan, it may be pertinent to note that the Vice Chancellor

---

3. For example, the phrase "in connection with" (At 1171–1172), which is in two of the documents, may be construed to mean a joining or linking, or only as "an accompanying or associated feature". *The Random House Dictionary* (2d ed.) p. 431.

did not find that either plan was a sham or a fraud, nor do plaintiffs now argue that it or they were.

My difference with the majority may arise because it seems to confuse the intention of the parties in agreeing to the terms of § 3.8 of the Stock Warrants with the intention of Continental in granting the Stock Option to employees. Thus the Court, after reciting the several memos to which I have referred, said that the Employee Option was issued in exchange for Continental stock and "[t]his construction of § 3.8 is clearly supported by the intentions of the parties." (*Ante*, at 1166). That begs the critical question—which is, did Continental intend to and did it in fact make it merger consideration? If it did so, then it was "property" under § 3.8 and American General is entitled to it. If it did *not*, then the option is not merger consideration. The difference is crucial and the material facts and inferences therefrom are in dispute in the record now before us.[4]

I concede that, after a final hearing, plaintiffs might prove that the Employee-Option was, in fact, merger consideration and that the "two-step" transaction argued by defendants was only an attempt to disguise a benefit for Continental/Texas Air insiders. But what Texas Air intended in granting the option (and what the true facts were with respect to it) are at the core of the conflict and, summary judgment is ordinarily inappropriate when intent of a party is at issue. *Continental Oil Company v. Pauley Petroleum, Inc.*, Del.Supr., 251 A.2d 824, 826 (1969). And it seems to me that, on the present record, it is inappropriate here.

\* \* \*

Respectfully, I dissent.

---

4. The majority dresses down Texas Air for an attempt to "manipulate the Delaware courts." (At 1169) I find no such attempt. Texas Air was sued, it had a right to defend itself, and before a decision was made by the Court of Chancery on the motions for summary judgment, it apparently took action to vacate the entire Option plan, if it lost the suit. In doing that I find nothing sinful in law nor disrespectful of our Courts. The issue is simply whether Texas Air's action was legally effective, the majority concludes that it was not and I agree, once it is determined that the Option was merger consideration, or that Texas Air is estopped from denying that on the basis of a prior representation to the Court of Chancery.