IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DONALD A. LOCKWOOD and<br>DARIN A. LOCKWOOD, | §<br>§<br>§ | No. 89, 2014 |
| Defendants Below-<br>  Appellants, | §<br>§<br>§<br>§ | Court Below:  Superior Court<br>of the State of Delaware in and |
| v. | §<br>§ | for New Castle County |
| LOUIS J. CAPANO, III, | §<br>§<br>§ | C.A. No. 10C-11-228 |
| Plaintiff Below-<br>Appellee. | §<br>§<br>§ | |

Submitted:  October 29, 2014
Decided:  November 10, 2014

Before **HOLLAND** and **RIDGELY**, Justices, and **BOUCHARD**, Chancellor.[*]

***O R D E R***

On this 10th day of November 2014, it appears to the Court that:

(1) Defendants-Below/Appellants Donald A. Lockwood ("Donald") and Darin A. Lockwood ("Darin") (collectively, the "Lockwoods") appeal from a Superior Court order denying, in part, their renewed cross-motion for summary judgment and granting, in part, the renewed cross-motion for summary judgment of Plaintiff-Below/Appellee Louis J. Capano, III ("LIII"). The Lockwoods raise one claim on appeal. The Lockwoods contend that the trial court erred by granting summary judgment in favor of LIII and that it should have entered judgment in

[*] Sitting by designation pursuant to art. IV, § 12 of the Delaware Constitution and Supreme Court Rules 2(a) to fill up the quorum as required.

their favor. We find a material dispute of fact on the issue of contract formation that precludes summary judgment for any party. Accordingly, we reverse and remand for further proceedings consistent with this Order.

(2) This action arises from a failed business venture that originated in 2004.[2] LIII and his father, Louis J. Capano, Jr. ("LJC") (collectively, the "Capanos"), formed Milton Investments, LLC ("Milton"), in which they were the sole members. Donald and Darin Lockwood formed, and were the sole members of, Lockwood Brothers II, LLC ("LBII"). In December 2004, Darin and LIII, as authorized members of their respective companies, signed an agreement to form a new company, North Milton Development Group, LLC ("NMDG"). Under NMDG, the parties executed a series of agreements in connection with the purchase of land located outside of Milton, Delaware (the "Rust Property"). The parties planned to use the Rust Property for both commercial and residential real estate development.

(3) In order to purchase the Rust Property, NMDG entered into a loan agreement with Wilmington Trust Company ("WTC") for two loans. The first was a 2004 acquisition loan for $7,130,000 (the "Acquisition Loan"), and the second was a 2007 loan for $1,000,000 (the "Working Capital Loan") (collectively, "the Loans"). The Loans were originally represented to the trial court as having been

---

[2] Unless otherwise noted, the facts are taken directly from the Superior Court's January 09, 2014 Memorandum Opinion. *Capano v. Lockwood*, 2014 WL 606608 (Del. Super. Jan. 9, 2014).

guaranteed by all of the principals of Milton and LBII.  But LJC never signed the loan documents, and during depositions testified that he did not personally guarantee the loans.  LIII admits that he personally guaranteed the Loans, but there is no copy of his execution of some critical documents.

(4) One day prior to NMDG's formation, a contribution agreement (the "Contribution Agreement") was created.  The third recital of the Contribution Agreement states that Donald and Darin "are each guarantors of the Acquisition Loan" along with LJC and LIII.  Section 2 of the Contribution Agreement provides that in the event a "demand" was made by WTC upon "one or more but not all of the guarantors," the Lockwoods, on the one hand, and the Capanos, on the other hand, would have reciprocal rights of contribution against the other two individuals, jointly and severally, for payments made in excess of their liability share.  The Lockwoods each signed the Contribution Agreement and forwarded it to LIII.  LIII, however, failed to produce a signed copy of the Contribution Agreement.  LJC also never signed the Contribution Agreement and failed to execute any documents to commit to the personal guarantee.

(5) The downturn in the housing market precluded NMDG's planned development for the Rust Property.  By August 2010, NMDG was behind on its loan payments.  On September 24, 2010, WTC's then-Vice President Jeremy Abelson ("Abelson") sent an email to LIII stating:

3

Louis, we sent an email to Darin notifying him of the need to pay the October 1 payments for the two North Milton loans. These invoices have still not been paid for September 1. This is a quarter end, so it's extra "special." Thanks for your anticipated help on this matter.[3]

(6) The parties failed to produce LIII's response to this email. Five days later, Abelson sent another email to LIII, which stated: "Louis, sorry the nag, but the two loans are still due for 9/1. Will these two loans be paid for September?" LIII responded minutes later with "Will go to the bank today[]" and Abelson thanked him. Thereafter, LIII alone paid 100% of the monthly payments on the Loans through April 2011, totaling $192,509.20 on the Acquisition Loan and $26,999.78 on the Working Capital Loan.

(7) The original complaint in this case was filed in November 2010, and the case has been extensively litigated since that time. In November 2013, LIII and the Lockwoods filed renewed cross-motions for summary judgment. The trial court heard argument on the cross-motions and on January 9, 2014, issued a Memorandum Opinion granting in part and denying in part both motions. In so doing, the trial court required the Lockwoods' contribution on the Acquisition Loan, but found that that the Contribution Agreement did not apply to the Working Capital Loan. The trial court entered a Final Order of Judgment on January 27, 2014. This appeal followed.

---

[3] *Capano*, 2014 WL 606608, at *2.

4

(8) "The entry of summary judgment is appropriate only when the record shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. In an appeal from a trial court's decision to grant summary judgment, this Court's scope of review is *de novo* . . . ."[4] "A conditional contract is an executory contract, the performance of which depends on a condition."[5] "A condition precedent is either an act of a party that must be performed or a certain event that must happen before a contractual right accrues or a contractual duty arises."[6] "One may also speak of a condition precedent to the formation or existence of a contract."[7] "Thus, when the parties to a proposed contract have agreed that the contract is not to be effective or binding until certain conditions are performed or occur, no binding contract will arise until the conditions specified have occurred or been performed."[8] "[T]he parol evidence rule does not prevent the introduction of evidence to show that a written instrument is delivered on condition, oral or written . . . ."[9]

---

[4] *LaPoint v. AmerisourceBergen Corp.*, 970 A.2d 185, 191 (Del. 2009) (internal citations omitted).

[5] 13 Williston on Contracts § 38:1 (4th ed.) (internal citations omitted).

[6] *Id.* at § 38:7 (4th ed.) (internal citations omitted); *see also USH Ventures v. Global Telesystems Group, Inc.*, 796 A.2d 7, 10–11 (Del. Super. 2000) (addressing conditions precedent to formation of a contract).

[7] 13 Williston on Contracts § 38:7 (4th ed.) (internal citations omitted).

[8] *Id.*

[9] *Id.* at § 38:17 (4th ed.) (internal citations omitted).

(9) The Lockwoods argue that the Contribution Agreement never became a binding contract because all four parties were required to sign it.[10] They argue that LIII's failure to produce a signed copy of the Contribution Agreement and LJC's failure to sign the Contribution Agreement prevented the creation of a contract between the parties. Accordingly, the Lockwoods contend that the signature of all four parties was a condition precedent to the Contribution Agreement's formation.

(10) We find that there exists a genuine issue of material fact as to whether having all four parties sign the Contribution Agreement constituted a condition precedent to the contract's formation. Accordingly, we reverse and remand this matter so that this factual determination can be made at a trial. We note that even if it is determined that the signature of each of the four parties was a condition precedent and the Contribution Agreement is not a valid contract, LIII may still have a basis to pursue equitable relief on an amended complaint.[11] If necessary, the President Judge may seek the designation of the trial judge to sit as Vice Chancellor pursuant to Del. Const., art. IV, § 13(2) to complete the disposition of the case.[12]

---

[10] *See* Appellant Darin Lockwood's Op. Br. at 12; Appellant Donald Lockwood's Op. Br. at 12.

[11] *See Levy v. HLI Operating Co., Inc.*, 924 A.2d 210, 220 (Del. Ch. 2007) ("An equitable right of contribution arises when one of several obligors liable on a common debt discharges all, or greater than its share, of the joint obligation for the benefit of all the obligors. To succeed on a contribution claim, a party must show concurrent obligations existed to the same entities, and that the obligors essentially insured the same interests and the same risks.") (internal citations omitted).

[12] Del. Const., art. IV, § 13(2).

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior

Court is **REVERSED** and this matter is **REMANDED** for further proceedings

consistent with this Order.

BY THE COURT:

/s/ Henry duPont Ridgely
Justice